UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

CHRISTA O'NEILL,                                          **22 cv**
                          Plaintiff,
                                                         **COMPLAINT**
        -against-
                                                         **JURY TRIAL DEMANDED**

NEWBURGH ENLARGED CITY
SCHOOL DISTRICT,

                          Defendants.
-----------------------------------------------------X

## INTRODUCTION

CHRISTA O'NEILL (hereinafter "Plaintiff") by her attorneys Stewart Lee Karlin Law Group, PC, complaining of Defendant, NEWBURGH ENLARGED CITY SCHOOL DISTRICT (hereinafter "Defendant"), alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.  This is an action pursuant to Title VII and the New York State Executive Law 291 et. seq. where Plaintiff alleges that Defendant discriminated against her based on her race (African-American).   This action seeks compensatory damages including emotional distress; damages to Plaintiff's reputation; other damages; reasonable attorney fees plus the costs and disbursements of this lawsuit, such other and further relief as the Court deems just and proper.

## PARTIES AND JURISDICTION

2.  At all times hereinafter mentioned, Plaintiff Christa O'Neill (hereinafter mentioned as "Plaintiff or "Ms. O'Neill"), resides within the State of New York. Plaintiff is an

employee as defined by the Title VII and the New York State Executive Law 291 et. seq.

3.    Defendant Newburgh Enlarged City School District (hereinafter "the District") is a political subdivision of the State of New York and is charged by law with responsibility for the operation, management, and control of the City of Newburgh's public education. Defendant Newburgh School District is within the jurisdiction of this Court, organized and existing under the laws of the State of New York with a principal place of business located in Orange County.

4.    At all relevant times, Defendant Newburgh School District Defendant is an "employer" as defined in Section 701(b) of Title VII of the Civil Rights Act of 1964 42 USC § 2000e.  As such, Defendant is subject to the requirements of Title VII (42 USC § 2000e et seq.). Defendant is also employer within the meaning the New York State Executive Law (NYSHRL)).

5.    Jurisdiction is invoked pursuant to Title VII 42 USC 2000e et. seq,.  Plaintiff filed EEOC charges based on race discrimination and a notice of right to sue letter was received within ninety days of the filing of this lawsuit conferring concurrent jurisdiction upon this Court. (See Exhibit "A")

## **FACTUAL STATEMENT**

6.    Plaintiff is African American, subjected to ongoing race discrimination as set forth below.

7.    Christa O'Neill is a tenured Speech and Language Pathologist working for the Newburgh Enlarged City School District ("District") for over 19 years. For the past nine years, she has been assigned to the District's South Middle School.

8.    Ms. O'Neill received her bachelor's degree from Marymount Manhattan College and her graduate degree from Teachers College, Columbia University.  She holds a permanent New

York State certificate as a Teacher of the Speech and Hearing Handicapped and a certificate of clinical competence from the American Speech-Language-Hearing Association.

9.   On June 24, 2022, the District commenced a 3020-A her based-on allegations she did not contemporaneously complete speech session logs and or IEP Direct service logs. This reason directly relates to the disparate treatment set forth below.

10.  The District did not charge Ms. O'Neill with failing to provide those sessions. Nor has the District alleged any student was impacted by the alleged failure to complete the session logs or IEP Direct service logs.

11.  Ms. O'Neill is the only African-American speech therapist in the District. There are approximately twelve or thirteen speech therapist employed by the Defendant.

12.  Ms. O'Neill had positive reviews until AP Vincent Brancato) (Caucasian) began working at South Middle School (With Lisa Buon as Principal).In addition, Ms. O'Neill's supervisors are Caucasian to wit, Chris Bayer and Janet Orwick.

13.  Ms. O'Neill has been working at South Middle School, grades 6 to 8, for about ten years.

14.  Ms. O'Neill has been subjected to disparate treatment because of her race.

15.  For example, she was assigned an excessive caseload compared to her similarly situated peers.  In fact, her similarly situated peers had no more than 65 cases, while Ms. O'Neill had approximately 80 or more case contrary to New York State law that prohibits a speech therapist from having more than 65 cases.

16.  In addition, the Ms. O'Neill was given a caseload over 65 cases for multiple years even after alerting her Directors/Supervisors that her high caseload was illegal and a disservice to the students.

17.  Subsequently, Ms. O'Neill requested that her caseload be reduced, and eventually

(belatedly) the District complied with her request, reducing Ms. O'Neill's caseload from

As a Speech and Language Pathologist with the District, Ms. O'Neill is tasked with providing speech and language services to students who have been identified as needing those services and whose Individual Education Programs ("IEPs") require such services.

18.   Ms. O'Neill had the most case consistently throughout her tenure.  In fact, one year Ms. O'Neill had 92 students assigned to her.

19.   Before the COVID-19 pandemic, Ms. O'Neill performed her work according to a set schedule, during which she provided multiple 30-minute individual and group speech sessions per day.. Pre-pandemic, she had one 45-minute prep period during which she would contact parents, prepare materials for sessions, and document sessions..

20.   As part of her responsibilities, Ms. O'Neill is required to document her speech sessions via the IEP Direct platform. Documenting those services requires a multi-step process detailed by Ms. O'Neill at the hearing:

21.   Ms. O'Neill explained the process: (1) type into the search bar and search student ID; (2) then you select the student you're  putting in the log for; (3) then you would go to related service logs and click; (4) then you would go to a drop-down that said "service provided" if there was a traditional service.(5) you would go to a different drop- down, select the ratio of the students in the group. (6) Then you would go to a different drop-down and select setting. (7) then go to a different drop- down and select the time, start time, for example, 11:30 then end time12:00; (8) Then you would go to another drop-down and you'd have to select the CPT code, the appropriate CPT code; (8) then you go to another drop-down  and select  the ICD code;   (9) then you would have to on the side make sure that the correct date is selected and check the correct date; (10) then you would hit save, and it would save

all of that information and bring you to another section where you would enter a log note; (11) the  you would have to manually type what happened in the session. And then you click save again. (12) then you would have to sign that session note and click save again. And after all of that is done then you click save and return.

22.   Ms. O'Neill would have to do this for every student, for every session.  She had about fifty students and each student had multiple sessions during a week.

23.   Ms. O'Neill has been disciplined once before for conduct related to the documentation of speech services.. That discipline was resolved by a July 15, 2019, Stipulation of Settlement ("Settlement") and the District withdrew the charges. Those charges applied only to the 2016-2017 and 2017-2018 school years.

24.   In addition, the Ms. O'Neill has been moved over seven times in about twelve years. To Plaintiff's knowledge no other Speech and Language Pathologist were moved with such great frequency.  Most Speech and Language Pathologist stayed put at one or two schools for years at time.  In fact, one Speech and Language Pathologist stayed at the  same school for over twenty years.

25.   Moving with such frequency adds a substantial burden since the Speech and Language Pathologist most become familiar with the students' prior history, establish a rapport with the students and also plan a strategy that works best so that the students can educationally progress.   In addition, one has to become familiar with new staff, administrators and the rules of building.

26.   Ms. O'Neill has been subjected to microscopic scrutiny.

27.   For example, Ms. O'Neill's Director/Supervisor ( Daniella Lans-Caucasian)  followed Ms. O'Neill and reported her daily activities to other colleagues such as psychologists and lead

teachers and supervisors. To Plaintiff's knowledge, no other Speech and Language Pathologist is subject to this level of scrutiny.

28. Ms. O'Neill requested Covid child care accommodations but was denied the accommodations request. Ms. O'Neill requested fifteen minutes in the morning for daycare and was denied the request.

29. Principal Chante Brooks stated that there was no flexibility for childcare. However, other Caucasian colleagues received these accommodations. However, upon information and belief, other individuals had child care accommodations, such as Lydia Rose (Caucasian), and related service providers such as Jenna Trapani.

30. In addition to these challenges, the District imposed additional responsibilities above and beyond her regular duties. Ms. O'Neill was asked to cover classes on an almost daily basis.

31. The additional responsibilities subsumed Ms. O'Neill's prep period, lunch, and medaid/report paperwork time and other times when not providing speech services. Some days, Ms. O'Neill did not have enough time to use the restroom because of the time constraints.

32. The disparate treatment regarding class coverage during the 2020-2021 school year was because Plaintiff was required to cover for teachers who were quarantining, and who were out from Covid and other illnesses. However, upon information and belief, no other related service providers in Plaintiff's building was required to cover classes for teachers that were out and Plaintiff believes that no other Speech and Language pathologist was required to cover classes. During the 2020-2021 school year, Ms. O'Neill had to cover between one hundred to one hundred and fifty classes.

33. Ms. O'Neill was also assigned supervisory duty as well as hall supervision during teachers

transition periods.  This involves standing in the hall during transition periods (five to ten minutes) about three to four times a day, the other Speech and Language Pathologist including the Speech and Language Pathologist in her building  do not have the hall and supervisory duties.

34.   Previously,  the therapy  room was given to the literacy coach by then principal Lisa Buon, even after grievance was filed and informed that sharing a classroom with 3 other classes during therapy sessions was in violation of regulations and privacy)

35.   Further acts of disparate treatment required extensive paperwork concerning attendance that similarly situated peers did not have to do. Ms. O'Neill was also required to complete a Google attendance document.

36.   No other Speech and Language Therapist had to perform the arduous and time consuming task of documenting attendance and services performed on Google docs. (Which the following year was grieved by the union and found to violate the contract with the Union winning the grievance)

37.   A typical group speech therapy session is 30 minutes.  Each group has about 3 to 5 students, and Ms. O'Neill has at least 30 group sessions per week.  Regarding Google docs, to complete all of the paperwork requested ( which was not required for any other speech therapist) took about two to three minutes per child. To complete this paperwork during the session would take valuable speech therapy time away from the students and would be contrary to the requirements in the IEPs of these students that required a certain amount of speech therapy per week. Ms. O'Neill stressed that point with her supervisors and A.P.

38.   In addition, the request was made in January that Ms. O'Neill go back to the beginning of the year and complete all of the paperwork.  Again, no other speech therapist was required

to do this paperwork to Ms. O'Neill's knowledge and entailed many hours of additional paperwork.

39.   This was in addition to her already demanding schedule and something that had never been asked of her before. It is also the subject of a pending grievance. The attendance document was introduced in January 2021, but Ms.  O'Neill was expected to complete it retroactively to the start of the 2020-2021 school year. The directives surrounding this document changed throughout the year, and with those changes, the time commitment increased as batch entries were no longer allowed. Tr.   Ms. O'Neill was instead required to enter each session, line-by-line tediously.

40.   Upon information and belief, no other Speech and Language Pathologist (none are African-American) were required to complete a Google attendance document for each child and to complete it retroactively to the start of the 2020-2021 school year.

41.   At the start of the 2020-2021 school year, the District was in the throes of the COVID-19 pandemic. In response, the District started the school year fully remote, with all students attending school virtually. Gradually, the District expanded to in- person instruction, taking a hybrid approach whereby a limited number of students were in the school buildings on a given day while the others were remote.

42.   During the pandemic and the District's hybrid instruction, Ms. O'Neill provided services for her caseload of over 50 students. However, due to the challenges of the hybrid, remote and in-person model, Ms. O'Neill was forced to provide those services both in-person and virtually through Google Classroom.. This also created a substantial amount of extra work.

43.   Ms. O'Neill's professional pandemic stressors were further compounded by issues in her personal life. This was documented in her February 23, 2021, email to Janet Orwick; Ms.

O'Neill wrote, "It has been very busy here and personally. I have been trying to not take any leave as I know we are very short handed." Ms. Orwick never followed up to see what she meant or to see if she Ms. O'Neill needed any support.

44. Also, Ms. O'Neill's husband was injured at work and was out on disability. Both of her elderly and infirm parents contracted the virus caused by COVID-19 between the Fall and Winter of 2020 and 2021.

45. Further, Ms. O'Neill's father-in-law had a massive heart attack requiring open-heart surgery and then months of recuperation at Ms. O'Neill's house.

46. On top of that, Ms. O'Neill's daughter faced the challenges of negotiating a senior year turned upside down by the pandemic. Ms. O'Neill explained all of this to her school principal, Chante BrooksDespite these myriad challenges, Ms. O'Neill took less than ten days off all school year because she knew the District could not spare another employee.

47. Because many of Ms. O'Neill's students were remote and could potentially be forced remote due to a COVID-19 infection or quarantine, the District required the parents of all students on Ms. O'Neill's caseload to consent to teletherapy. Consent was to be provided through a Google document consent form.

48. Despite Ms. O'Neill's efforts, including posting the form to Google Classroom and multiple emails and calls encouraging parents to complete the form, only seven or eight of Ms. O'Neill's 50 students returned the consent form. The lack of consent directly impacted Ms. O'Neill's reporting of services and whether those sessions counted as "units" for Medicaid billing purposes.

49. Following a conversation regarding the impact of not having a consent form for the majority of students, Ms. O'Neill's department agreed those students, when not attending

an in- person session, should be noted as "student not available" for sessions logged via IEP Direct and a note would be made that no consent form was provided, and the student was not in the building due to COVID-19.

50.   Ms. O'Neill discussed this manner of reporting with both South Middle School Principal, Chante Brooks and Assistant Principal, Vincent Brancato.  Ms. O'Neill also explained that she was not comfortable providing attendance information in the Google attendance document for remote students whose parents had not consented to teletherapy.

51.   Lack of a consent form also impacted the reporting of sessions. Ms. O'Neill explained that when a student was indicated in IEP Direct as "student not available" for a session because their parents had not consented to teletherapy, that session would not count towards the units required according to a student's IEP and the District was unable to bill Medicaid for that session.. This is indicated in the Summary of Related Session Notes where, despite there being a session log for a student on a given day, if that session was virtual and the student indicated as "student not available", the CPT Units column would read "O."

52.   The session would not count towards the required units indicated in IEP Direct RS Attendance Summary reports. This meant that while there may be a log for a session, the mere existence of a log would not be reflected in the RS Attendance Summary reports. Accordingly, the Summary of Related Session Notes, not the RS Attendance Summary reports, is the best evidence of whether and when a session was provided and logged.

53.   In the Spring of 2021, District administration raised concerns regarding Ms. O'Neill's documentation of services.  Meetings were held to discuss these concerns at which Ms. Brooks and Mr. Brancato informed Ms. O'Neill that they did not believe she was current with her attendance recording. The focus of those meetings was on the Google attendance

document that Mr. Brancato had directed Ms. O'Neill to complete.

54.  At the first meeting, around March of 2021, Ms. O'Neill proposed solutions regarding how she might streamline the attendance process. Her suggestions were ignored. She also explained the difficulties she had in completing the attendance records. These concerns were also ignored.

55.  Ms. O'Neill explained how time-consuming the data entry expectations were on top of her already demanding schedule and, again, was ignored.

56.  Ms. O'Neill also explained the ethical concerns she had regarding entering attendance data for students without consent forms and how Mr. Brancato wanted to count those students.

57.  In response to Mr. Brancato's statement that teachers are required to keep attendance in a similar fashion, Ms. O'Neill explained that teachers have access to the Infinite Campus platform which is structured in a way to allow them to enter attendance through clicking on set options rather than manually entering the data as the Google document required. There was no discussion of IEP Direct during the first meeting.

58.  The second meeting, held around late-March 2021, was disciplinary in nature. Again, Ms. Brooks and Mr. Brancato attended along with Ms. O'Neill and her union representative. Again, the Google attendance document was discussed and Ms. O'Neill was directed to complete the document line-by-line. She was also directed to complete attendance in IEP Direct.

59.  Following that meeting, Ms. O'Neill did her best to comply with the directives. She completed the Google document line-by-line and brought IEP Direct current. She worked after hours and sometimes late into the evening.

60.  On or about April 5, 2021, Ms. O'Neill was given a letter detailing the administration's

expectations of her going forward.  The letter purportedly serves as the District's 45-day notice required by the Settlement Agreement and memorializes the discussion held at a March 17, 2021 meeting with Ms. O'Neill.

61.    In response to the letter, Ms. O'Neill continued to work to satisfy the directives to the best of her ability.. She prioritized the Google document as, based on what the administration had stressed during the meetings, she felt this was the most important. Id. No one ever explained what item should take priority. However, the Google document appears first in bulleted list of "outstanding matters."

62.    A final meeting was held on June 10, 2021. In attendance were Ms. O'Neill, Janet Orwick, Ms. Brooks and Stacy Moran, president of the local union and Ms. O'Neill's union representative.

63.    The meeting went over the April 5, 2021 letter and its directives. Ms. O'Neill invoked her Cadet rights and did not answer any questions. Following that meeting, Ms. O'Neill continued to complete her duties as a Speech and Language Pathologist with the District to the best of her ability..

64.    On or about June 24, 2021, the Ms. O'Neill was served with 3020A charges in an attempt to terminate her due to her race.

65.    A 3020a hearing was held and on May 9, 2022 a decision terminating Ms. O'Neill was issued. The Hearing Officer held that although acknowledging the extraordinary circumstances regarding the 2020-2021 pandemic year, Ms. O'Neill's failure to contemporaneously enter the information at issue in IEP Direct was a problem before the Covid19 pandemic. While the conduct is not alleged in the charges, in this case, and there was no discipline used the uncharged and undocumented alleged issue as justification for

12

her the challenges that undermined the presented by the Covid-19 pandemic.

66. Ms. O'Neill was a target when the Director moved a special education classroom into the building while she was based at Horizon on The Hudson  Elementary School,  displacing speech therapist of her therapy room necessitating her therapy room be relocated to a cafeteria room and put her items on a garbage can by the principal Lisa Buon of Horizonson the Hudson.  The District gave Ms. O'Neill a room unfit for therapy.

67. The issue of disparate treatment regarding the documentation of attendance and race discrimination was not raised nor decided at the 3020a hearing.

68. One of Ms. O'Neill's 6th-grade students wrote inappropriate comments on his Google classroom towards Ms. O'Neill (using curse words).  Ms. O'Neill went to AP Vincent Broncotto, who took no action against the student.

69. On or about May 9, 2022, Ms. O'Neill was terminated.

70. As a result of the foregoing, intentional continuing discrimination and retaliation, the District violated Title VII, and  the  Executive Law § 296, by discriminating against Plaintiff due to her race. Plaintiff has been subjected to an ongoing, continuous, intentional pattern of race discrimination and retaliation that has created a hostile work environment and disparate treatment.

71. The above conduct is intentional willful, deliberate and continuous conduct that is a pattern of race discrimination.

72. At all times relevant, Plaintiff performed her job responsibilities in an exemplary manner.

73. It has been necessary for Plaintiff to engage the services of an attorney to file and prosecute this action, and thus also request attorneys' fees.

74. Plaintiff duly served a notice of claim, a statutory 50H statutory hearing was held and

more than 30 days have elapsed without the claim being adjusted by the District.

## FIRST CLAIM FOR RELIEF-TITLE VII

75.  Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with

the same force and effect as it more fully set forth herein.

76.  Based upon the foregoing, the Plaintiff has been subjected to a hostile work environment,

disparate treatment and otherwise discriminated against based on her race, in violation of

Title VII of the Civil Rights Act of 1964, 42 USC 2000e et. seq.

77.  Defendant acted maliciously, wantonly, and in conscious disregard of Plaintiff's

rights and Defendant's statutory obligations and as a result, Plaintiff has been damaged.

## AS AND FOR A SECOND CAUSE OF ACTION-NYSHRL

78.  Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above

with the same force and effect as it more fully set forth herein except paragraphs numbered

65 and 69 pertaining to Plaintiff's actual termination.

79.  As a result of the foregoing intentional continuing discrimination and retaliation, the

Defendant violated Executive Law § 296, by discriminating against Plaintiff due to her

race (African-American),. As a result of the foregoing, Plaintiff was subjected to disparate

treatment and a hostile work in violation of the NYS Executive Law 296 et. seq.

80.  As a result of Defendant violating the NYSHRL, Plaintiff has been damaged.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues and claims in this action.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.      Equitable relief pursuant to Title VII only including a declaration that Plaintiff

was terminated due to her race and reinstatement to the position of Speech and

Language Pathologist including restoring her seniority and benefits retroactively

2.      Compensatory damages including emotional distress;

2.      Damages to Plaintiff's reputation;

3.      Backpay;

4.      A reasonable attorney fees plus the costs and disbursements of this lawsuit,

5.      Such other and further relief as the Court deems just and proper.


Dated: New York, New York
       June 15, 2022                              Respectfully Submitted,

                                                  STEWART LEE KARLIN
                                                  LAW GROUP, PC


                                                  STEWART LEE KARLIN, ESQ.
                                                  Attorneys for Plaintiff
                                                  111 John Street, 22nd Floor
                                                  New York, NY 10038
                                                  (212) 792-9670
                                                  slk@stewartkarlin.com