UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
CHRISTA O'NEILL,

                      Plaintiff,                  **OPINION AND ORDER**

      -against-                         22 Civ. 5017 (JCM)

NEWBURGH ENLARGED CITY
SCHOOL DISTRICT,

                      Defendant.
---------------------------------------------------------------X

      Plaintiff Christa O'Neill ("Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL") against Defendant Newburgh Enlarged City School District ("Defendant" or the "District") alleging employment discrimination and a hostile work environment. (Docket No. 1).[1]

      Currently before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion"). (Docket Nos. 42, 43).  Plaintiff opposed the Motion, (Docket No. 51), and Defendant replied, (Docket No. 60).  For the reasons set forth below, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII employment discrimination claim.[2]  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL claim, and that claim is, accordingly, dismissed without prejudice to renew in state court.[3]

---

[1] Plaintiff received a Notice of Right to Sue letter from the Equal Employment Opportunity Commission, dated May 23, 2022. (*See* Def. Ex. JJJ).

[2] Plaintiff initially pleaded claims for both employment discrimination and a hostile work environment under Title VII. (Docket No. 1 ¶¶ 75-77).  However, in opposition to the Motion, Plaintiff withdrew "her hostile work environment claim under Title VII and is proceeding under state law only." (Docket No. 51 at 31).  Thus, the only remaining federal claim is for employment discrimination under Title VII.

[3] The parties have consented to the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Docket No. 39).

I.    **BACKGROUND**

The following facts are taken from Defendant's Statement of Material Facts submitted

pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and

Eastern Districts of New York ("Def. 56.1"), (Docket No. 46), Plaintiff's Response to

Defendant's Local Civil Rule 56.1 Statement ("Pl. 56.1 Resp."), (Docket No. 46-1), and the

affidavits and exhibits submitted by the parties in support thereof.[4]  The following facts are

construed in the light most favorable to Plaintiff as the party opposing summary judgment. *See*

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  Any disputes of material fact

are noted.[5]

A.    **Plaintiff's Employment in the Newburgh Enlarged City School District**

Plaintiff, an African American woman, worked in the Newburgh Enlarged City School

District as a tenured Speech/Language Pathologist ("SLP") from March 19, 2003 to May 10,

2022. (Def. 56.1 ¶ 3).  She was one of approximately sixteen SLPs in the District. (*Id.* ¶ 23).  In

2020-2021, Plaintiff was assigned to two schools: South Middle School ("SMS") and San

Miguel Academy ("San Miguel"). (*Id.* ¶ 24).  She worked primarily in SMS but traveled to San

Miguel two to three days a week. (*Id.*).  Plaintiff was the only SLP at either school, (*id.* ¶¶ 25-

26), and reported primarily to three individuals: (i) the Principal of SMS, Chante Brooks; (ii) the

Assistant Principal of SMS, Vincent Brancato; and (iii) the Director of Special Education, Janet

---

[4] Specifically, Defendant submitted two declarations from its attorney, Deanna L. Collins, attaching sixty-nine exhibits, (Docket Nos. 44, 45, 60) ("Def. Exs. A-SSS"), as well as a reply affirmation from Ms. Collins, attaching an additional thirteen exhibits, (Docket No. 60).  In response, Plaintiff submitted: (i) a declaration on her own behalf, (Docket No. 52) ("Pl. Decl."); (ii) a declaration from one of her attorneys, Natalia Kapitonova, (Docket No. 53); and (iii) an affirmation from another one of her attorneys, Stewart L. Karlin, attaching six exhibits, (Docket No. 54).

[5] Defendant argues that nearly all its statements of fact submitted under Rule 56.1 should be deemed admitted because Plaintiff's responses are conclusory and fail to cite to admissible evidence. (Docket No. 43 at 31).  Rather than issue a blanket ruling, the Court will address the sufficiency of Plaintiff's responses on a statement-by-statement basis as necessary for resolution of the Motion.

Orwick,[6] (*id.* ¶¶ 27-28).  Ms. Brooks was African American, while Mr. Brancato and Ms.

Orwick were Caucasian. (Docket No. 51 at 1-3).

In her role as a SLP, Plaintiff was "required to provide therapy services, to write and

update Individualized Education Plan ("IEP") goals for students with mandated speech therapy

on her caseload, as well as to keep ongoing needed records." (Pl. 56.1 Resp. ¶ 5).  These records

included student attendance and "speech language service information," which she was supposed

to enter in a program called "IEP Direct." (*Id.* ¶ 6).  The parties dispute the frequency with which

Plaintiff was required to enter this information.  Defendant alleges that she was required to enter

it "within thirty days" of each session, while Plaintiff claims it "should be inputted as soon as

reasonably practical." (*Compare id.* ¶ 9 *with* Pl. 56.1 Resp. ¶ 6).  However, neither party disputes

that Plaintiff was required to input this information as part of her job responsibilities. (*Id.*).  This

data was used by the District to track student progress and bill Medicaid for services rendered.

(Def. 56.1 ¶ 8.).  The crux of the parties' current dispute is whether Plaintiff's inconsistent

recordkeeping was a proper basis for her termination, or if it was merely a pretext to fire her

because of her race.[7]

## B.    Allegations of Prior Misconduct

Plaintiff's inconsistent recordkeeping first became a problem during the 2008-2009

school year when she failed to submit documentation required to bill Medicaid. (*Id.* ¶ 32).

Plaintiff claims she does not recall this incident, but Defendant submitted contemporaneous

---

[6] Plaintiff disputes the degree to which Ms. Orwick was responsible for supervising her work, alleging that she had only indirect supervisory responsibility over her. (Pl. 56.1 Resp. ¶ 29).

[7] Defendant maintains that Plaintiff's recordkeeping was not merely inconsistent, but that for extended stretches of time it was non-existent. (*See* Docket No. 43 at 3-10).  Plaintiff does not dispute that at times she did not enter information in a timely manner but claims that this was due to her increased responsibilities during the COVID-19 pandemic and that she entered the information as soon as "reasonably practical." (*See* Pl. 56.1 Resp. ¶ 9; Docket No. 51 at 6-10).

records in support of the allegation. (*See* Pl. 56.1 Resp. ¶ 32; Def. Ex. Y).  The problem occurred

again during the 2016-2017, 2017-2018, and 2018-2019 school years. (Def. 56.1 ¶ 33).  During

the 2018-2019 school year, Ms. Orwick discovered that Plaintiff's records were not up to date

and, upon further investigation, she learned that the problem extended through the prior two

school years as well. (*Id.*).  As a result, the District filed Section 3020-a charges[8] against Plaintiff

and placed her on administrative leave while the charges were adjudicated. (*Id.* ¶¶ 35-36).  The

charges filed included, among other things, "(1) failing to document approximately 844

mandated speech and language therapy sessions for approximately 64 students . . . during the

2016-2017 school year; and (2) failing to document approximately 1,385 mandated speech and

language therapy sessions for approximately 54 students with IEPs during the 2017-2018 school

year." (*Id.* ¶ 37; Def. Ex. AA).

## C.    The Stipulation of Settlement

On July 15, 2019, the parties agreed to settle these charges, which was memorialized in a

Stipulation of Settlement (the "Stipulation"). (Def. 56.1 ¶ 39; Def. Ex. D).  Pursuant to the

Stipulation, Plaintiff "admit[ed] that during the 2016-17 and 2017-18 school years she did not

accurately document speech services for certain students on her caseload: [and that] [b]y

engaging in this conduct, [Plaintiff] admits that she engaged in neglect of duty within the

meaning of Education Law Section 3012." (Def. Ex. D at 3).  The Stipulation also required

Plaintiff to pay a $40,000 fine and agree to a "Last Chance Provision," which states:

> If at any time prior to the last day of the 2021-22 school year, additional
> Education Law 3020-a disciplinary charges are preferred against Ms. O'Neill and
> she is determined by the appointed hearing officer to have engaged in neglect of

---

[8] "Section 3020-a charges" refers to Section 3020 of the New York Education Law, which requires schools to abstain from disciplining or removing providers "except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement covering" the provider's "terms and conditions of employment." N.Y. Educ. Law § 3020.

duty substantially similar to that referenced in Paragraph 1 and/or for the failure
to deliver recommended [] IEP Speech and Language services to the students on
her caseload and/or failure to accurately and contemporaneously document
(within 30 days of service delivery) Speech and Language services she delivers or
is required to deliver to the students on her caseload, as defined by and subject to
law and regulation, and she is determined by the appointed hearing officer to have
engaged in this conduct, the Employee expressly agrees that the penalty will be
her termination from employment as a teacher in the District. Whether the
Employee has engaged in conduct substantially similar to that set forth in
Paragraph 1 and/or fails to deliver recommended [] IEP Speech and Language
services to the students on her caseload and/or fails to accurately and
contemporaneously document (within 30 days of service delivery) Speech and
Language services that she delivers or is required to deliver to the students on her
caseload, as defined by and subject to law and regulation, will be determined
solely by the Hearing Officer appointed pursuant to the procedures of New York
State Education Law Section 3020-a. Ms. O'Neill shall be provided all of the due
process rights afforded to a tenured teacher at the hearing. Prior to invoking this
Last Chance Agreement and claiming a violation thereof, the District agrees to
provide Ms. O'Neill with a single notice of 45 days so as to provide her with an
opportunity to cure the alleged violation(s).

(*Id.* at 6-7).  In addition, in exchange for the District dismissing the charges, Plaintiff agreed to

waive "any and all claims that she might otherwise have asserted through the date of this

Agreement, as set forth above, pursuant to Title VII of the Civil Rights Act of 1964 with

Amendments, the Age Discrimination and Employment Act, Section 504 of the Rehabilitation

Act of 1973, Title I of the Americans with Disabilities Act of 1990, the New York State Human

Rights Law, 42 U.S. Code Section 1983, as well as any other claims or causes of action other

than those necessary to enforce the provisions of this Agreement." (*Id.* at 8).  Finally, both

parties agreed to:

issue releases in favor of the other in connection with the matters covered by this
Settlement Agreement. With respect to [the Plaintiff], the Release concerns any
claims, charges, suits, etc., whether known or unknown, which the District could
have brought against [her] as of the effective date of this Agreement. With respect
to the District . . . [the Plaintiff] releases the District . . . from any and all legal
liability in connection with the Employee's employment in the District through
the effective date of this Agreement.

(*Id.*).  Plaintiff does not deny the existence of the Stipulation, or that she signed it, but claims that she never admitted to the misconduct as stated in the Stipulation and that the circumstances of the prior charges are not substantially similar to the circumstances giving rise to this lawsuit, as required for the District to enforce the Last Chance Provision. (Pl. 56.1 Resp. ¶¶ 33-45).

**D.     The Circumstances Surrounding the Current Dispute**

**1.     IEP Direct Records**

In or about January 2020, Ms. Orwick discovered that Plaintiff had not kept her IEP Direct records up to date. (Def. 56.1 ¶ 47).  Consequently, the District scheduled a disciplinary meeting with her to examine her session notes for the prior school year. (*Id.* ¶ 48).  This meeting was postponed indefinitely when the District closed due to the COVID-19 pandemic and began educating students virtually. (*Id.* ¶ 50).  When the District reopened, it moved to a hybrid teaching model for the 2020-2021 school year, which required students to attend both synchronous and asynchronous classes. (*Id.* ¶ 53).  Synchronous classes required students to attend a live class via Google Meet, whereas asynchronous classes allowed providers to post work for students to complete on their own time by a date certain. (*Id.*).  Most teachers and providers used the time provided by asynchronous classes to catch up on their records. (*Id.* ¶ 54).[9]

The pandemic also changed how Plaintiff and similarly situated providers treated students who required IEP mandated speech therapy.  Students were now treated, at least in part, virtually.  As a condition of providing these virtual sessions, the District required students' legal guardians to execute teletherapy consent forms. (*Id.* ¶ 56).  These students were still treated even

---

[9] The District claims that it instituted "Asynchronous Wednesdays" during the COVID-19 pandemic where no one was "physically in the building and all classes were done asynchronously." (Def. 56.1 ¶ 51).  However, Plaintiff argues that only students were absent those days and that she was physically present along with other "staff." (Pl. 56.1 Resp. ¶ 55).

if they did not return the consent form, but the District required the providers to note the absence of a completed consent form in IEP Direct. (*Id.* ¶ 57).  The District claims that Plaintiff failed to do this for many of the students assigned to her during the 2020-2021 school year. (*Id.* ¶¶ 51, 58).  Plaintiff claims that this is incorrect and that she was marking students who did not return consent forms as "not available" in IEP Direct. (Pl. 56.1 Resp. ¶ 57).

This issue came to a head in February 2021, when Mr. Brancato began investigating the completeness of Plaintiff's attendance records. (Def. 56.1 ¶¶ 59-60).  He informed Ms. Orwick of his concern that Plaintiff was not recording notes regularly. (*Id.*).  Ms. Orwick then checked IEP Direct, which confirmed Mr. Brancato's suspicion, showing that Plaintiff's records were incomplete. (*Id.* ¶ 62).  Ms. Orwick notified Plaintiff that she needed to get her records up to date.  (*Id.* ¶ 63).  Plaintiff responded that she was working on it but was "very busy here and personally" and was trying to avoid taking time off since they were "very short handed." (Pl. 56.1 Resp. ¶ 64; Def. Ex. HH).  The District claims that other than this e-mail, Plaintiff did not mention having difficulty completing her records. (Def. 56.1 ¶ 65).  Plaintiff disputes this and claims that she told Ms. Brooks and Assistant Principal Arlene Almobobar that she was struggling to keep up with her records given her workload and personal issues. (Pl. 56.1 Resp. ¶ 65).  A month later, Ms. Orwick ran a report from IEP Direct for Plaintiff's records from September 1, 2020 through March 26, 2021. (Def. 56.1 ¶ 67).  The report listed, among other things, "how many sessions had been accounted for—either by indicating that the service was provided or that the student was absent, the provider was absent, the school was closed, etc." (*Id.* ¶ 68).  The report disclosed that Plaintiff only recorded notes for a small number of her student's required sessions, and that in total she failed to account for 887 sessions. (*Id.* ¶¶ 69-73).  Plaintiff does not dispute that this is what the report says but argues that the number of sessions required

per student was a goal, and that the report was not accurate because it did not include students who failed to return consent forms and were marked as "not available" in IEP Direct, even though they were provided therapy anyway. (Pl. 56.1 Resp. ¶¶ 73, 163).  However, Defendant submitted documentary evidence from the vendor that generated the IEP report, indicating that it did include students marked "not available" in the fields of the report generated. (Def. Ex. LLL at 1).

Based on this report, Ms. Brooks and Mr. Brancato directed Plaintiff and her union representative to attend a meeting with them on March 17, 2021. (Def. 56.1 ¶ 74).  The purpose of the meeting was to discuss Plaintiff's alleged failure to keep her records current. (*Id.* ¶ 75). Plaintiff chose not to make a statement at this meeting. (*Id.* ¶ 77).  Subsequently, on April 5, 2021, the District gave Plaintiff a 45-day notice, pursuant to the terms of the Last Chance Provision in the Stipulation, requiring her to catch up on all outstanding records by the end of the 45-day period. (*Id.* ¶ 78).  On May 20, 2021, Ms. Orwick ran a new report from IEP Direct for the same time period used previously—September 1, 2020 to March 26, 2021. (*Id.* ¶¶ 80-81). This report revealed that Plaintiff failed to get her records up to date and that 869 sessions remained undocumented. (*Id.* ¶ 82).  Plaintiff refutes this allegation in part, arguing that she completed "95-98 percent" of her IEP Direct records, which would be current by the end of the school year, and did complete the Google Spreadsheet, (*see infra* Section I.D.2), in its entirety, which she prioritized since "[n]o one ever explained what item should take priority." (Pl. 56.1 Resp. ¶¶ 80-83).  However, further investigation by Ms. Orwick revealed that Plaintiff accessed the IEP Direct system infrequently, and sometimes not for many months. (Def. 56.1 ¶¶ 86-88). Plaintiff denies this allegation and claims, without evidence, that IEP Direct reports "can be easily manipulated." (Pl. 56.1 Resp. ¶ 88).

On June 10, 2021, Plaintiff and her union representative met with the District again to discuss her deficient records. (Def. 56.1 ¶ 91).  Plaintiff, again, declined to make a statement on her own behalf. (*Id.* ¶ 92).  The District then filed formal charges against Plaintiff pursuant to the Last Chance Provision, for: (1) failing to keep her records current for "approximately 869 sessions of mandated speech therapy for approximately 47 students during the 2020-2021 school year;" and (2) failing to meet the prior 45-day directive to get those records up to date. (*Id.* ¶ 93).  She was suspended while the charges were adjudicated, and a hearing was held on January 26, 2022. (*Id.* ¶¶ 94-95).  After this hearing, on January 27, 2022, Ms. Orwick ran another IEP Direct report for the same September 1, 2020 through March 26, 2021 period, which showed that Plaintiff still had not updated all her records and failed to account for approximately 669 sessions. (Def. 56.1 ¶¶ 84-85; Def. Ex. E).  Plaintiff argues that this report suffered from the same problem as the prior reports since it did not include students marked unavailable because they failed to return the consent form, even though services were rendered anyway. (Pl. 56.1 Resp. ¶ 84).

Ultimately, on May 9, 2022, a hearing officer found that Plaintiff engaged in the misconduct alleged, and the District then terminated her employment pursuant to the Last Chance Provision of the Stipulation. (Def. 56.1 ¶ 96). The termination was effective as of May 10, 2022. (*Id.* ¶ 97).

**2.      The Google Attendance Spreadsheet**

The pandemic changed how attendance was recorded by providers at SMS. (Def. 56.1 ¶ 98).  Taking attendance is mandatory in the District, but teachers and providers recorded it differently. (*Id.*).  Prior to the pandemic, classroom teachers used a program designed for recording attendance called Infinite Campus, while pull-out service providers (*i.e.* teachers like

Plaintiff who provided services to students by pulling them out of their regular class) did not have access to that program. (*Id.* ¶¶ 99-103). When Mr. Brancato realized pull-out service providers did not have a system for recording attendance regularly and sharing it with the school's main office,[10] he instituted a new system on February 22, 2021, whereby Plaintiff, and similar providers at the school, were required to input student attendance in a Google Spreadsheet daily. (*Id.* ¶¶ 109-12). Plaintiff and her peers were also required to input all prior attendance records for the school year into the Google Spreadsheet by March 3, 2021, which required them to look at their IEP Direct records to determine which students attended therapy sessions and then transfer that information to the spreadsheet. (*Id.* ¶¶ 113-14, 119).

The parties do not agree on the burden the new system placed on providers. Defendant alleges it should have only taken "an average of 10 minutes to complete the Google Spreadsheet log each day," and that no other providers struggled to keep up. (*Id.* ¶¶ 116-18). Plaintiff disputes this and argues that it took her approximately "50 minutes per day [to complete the spreadsheet]." (Pl. 56.1 Resp. ¶ 116). In addition, Plaintiff argues that she was: (i) the only speech therapist in the District that had to complete the Google Spreadsheet; (ii) the only African American speech therapist at SMS that had to do so; and (iii) the only provider that had to complete the spreadsheet in addition to having to cover classes. (*Id.* ¶ 107). The District maintains that all pull-out providers at SMS, including non-African Americans at the school (such as occupational therapists, physical therapists and school psychologists), were required to complete the Google Spreadsheet, and Plaintiff was the only African American speech therapist required to do so because she was the only speech therapist assigned to the school and the requirement was limited to providers at that school. (Def. 56.1 ¶¶ 23-25, 107, 113). The District

---

[10] Plaintiff contends that this is incorrect because "the main office has access to IEP Direct and the teachers would input into Infinite Campus the pullout or push in service for the student." (Pl. Decl. ¶ 46).

further alleges that no other providers complained about the new spreadsheet, (*id.* ¶ 118), but Plaintiff points to an e-mail from the school psychologist where she states that "it will take a great deal of time" to get her attendance records inputted to rebut that claim, (Pl. 56.1 Resp. ¶ 118; Pl. Ex. 3).

Ultimately, Plaintiff was unable to complete the spreadsheet by March 3, 2021, and was forced to meet with Mr. Brancato and Ms. Brooks as a result. (Def. 56.1 ¶ 122).  They gave her two additional days to complete the spreadsheet, which was then extended numerous times to March 25, 2021. (*Id.* ¶¶ 123-32).  The District argues that Plaintiff struggled to complete the Google Spreadsheet because her IEP Direct records were incomplete, so she was unable to import that data into the new Google Spreadsheet. (*Id.* ¶ 133).  Plaintiff disputes this and claims that she did complete the Google Spreadsheet by the end of the 2020-2021 school year, and "had about 95-98 percent of IEP [D]irect completed[.]" (Pl. 56.1 Resp. ¶ 133).  Further, she argues that the District did not tell her whether IEP Direct should be prioritized over the Google Spreadsheet, and since the spreadsheet appeared first in a list of bulleted "outstanding matters" given to her, she assumed that was the priority. (*Id.*).  SMS stopped using the Google Spreadsheet at the end of the 2020-2021 school year when Plaintiff filed a grievance due to the additional work it required. (Pl. 56.1 Resp. ¶ 118; Pl. Decl. ¶ 24).

**3.    Plaintiff's Workload**

A central tenant of Plaintiff's argument is that the District discriminated against her by increasing her workload to the point where she could no longer keep up with her recordkeeping responsibilities. (Pl. 56.1 Resp. ¶ 141).  The District claims that she never had over 65 students in a single school year, and that "even if she did, the Settlement waived any claim arising from this matter." (Def. 56.1 ¶ 142).  Plaintiff admits that this is correct, but that "it is still relevant

background information" for her current allegations of racial discrimination. (Pl. 56.1 Resp. ¶ 142).

In addition, Plaintiff claims that the District discriminated against her by requiring her to cover classes during the pandemic even though "no other speech therapist (none who were African-American)" and "no other traveling service provider except Plaintiff" were required to do so. (*Id.* ¶¶ 147-49). In response, Defendant argues that all full-time providers working at SMS were required to cover classes during the pandemic, and the only reason no other speech therapist or traveling service provider was required to do so is that there were no others assigned to SMS in the 2020-2021 school year on a full-time basis. (Def. 56.1 ¶ 151). For example, SMS's physical therapist and occupational therapist were working on an "as needed" basis, so were not assigned "building duties during the day."[11] (*Id.*).

**4.   Plaintiff's Other Allegations of Misconduct by the District**

Plaintiff's Complaint contains several other allegations of improper treatment. First, Plaintiff alleges that she was subject to "microscopic scrutiny" by a prior supervisor, who followed her around. (Pl. 56.1 Resp. ¶¶ 137-38). Defendant denies that this is true, and the parties agree that because this supervisor resigned from the District in 2017, any alleged misconduct would have been covered by the Settlement and therefore is not actionable in this case. (*Id.* ¶¶ 139-40).

Second, Plaintiff argues that the District discriminated against her by denying her request during the 2020-2021 school year to come to SMS late due to family obligations. (*Id.* ¶ 152).

---

[11] Plaintiff also claims that she was previously required to cover speech therapy sessions at other schools prior to 2020-2021, and that she requested to remain at SMS instead. (Pl. 56.1 Resp. ¶¶ 143-46). The parties agree that the District granted this request and that any claims related to allegedly improper assignments prior to the 2020-2021 school year were covered by the releases in the Settlement. (*Id.*). However, Plaintiff claims that it is "relevant background information regarding her claims of race discrimination because it shows disparate treatment based on race." (*Id.*).

The District claims that they accommodated Plaintiff by switching her schedule to allow her to begin her day at San Miguel, which was closer to her youngest son's school and that, in any event: (i) Plaintiff's older son had a driver's license and vehicle at the time and often took Plaintiff's youngest child to school; and (ii) no other teacher was allowed to come to school late due to childcare obligations, except part-time teachers pursuant to the Families First Coronavirus Response Act ("FFCRA"). (Def. 56.1 ¶¶ 153-56).  Plaintiff counters that San Miguel was not closer to her youngest child's school and that her older son only drove her youngest child to school when she could not get a sitter. (Pl. 56.1 Resp. ¶¶ 154-56).  However, she submits no documentary evidence to support these assertions. (*Id.*).

Third, Plaintiff argues that she was discriminated against when the school refused to punish a student who made "inappropriate comments on his Google classroom" towards her. (Docket No.1 ¶ 68).  In an e-mail, the student asked Plaintiff to send him "the fricken class code" to "do my god dam homework," and referred to her as a "boomer." (Def. Ex. HHH at 7).  Neither party disputes that these comments were made or that Plaintiff then contacted the student's mother who apologized for her son's conduct. (Pl. 56.1 Resp. ¶¶ 157-60).  However, Plaintiff alleges that when she told Mr. Brancato about these comments, he refused to punish the student. (Docket No. 1 ¶ 68).

## E.    State Court Proceedings

On May 18, 2022, Plaintiff filed a proceeding pursuant to Articles 75 and 78 of the New York Civil Practice Law and Rules, claiming that the hearing officer's decision recommending her termination was arbitrary and capricious. (*See* Def. Ex. KKK[12]).  The District moved to

---

[12] *See Christa O'Neill v. Newburgh Enlarged City Sch. Dist.*, Index No. EF002886-2022 (Sup. Ct., Orange Cnty.).

dismiss, and on February 24, 2023, the Supreme Court of New York, Orange County, (the "Orange County Court"), denied the motion and granted the petition, holding that:

1) "[t]he circumstances of [Plaintiff's] prior case relating to the 2016-2017 and 2017-2018 school years could not have been substantially similar to the circumstances during the 2020-2021 school year due to covid," thus the Last Chance Provision could not have been the basis for her termination, (Pl. Ex. 1 at 9);

2) "the past performance by petitioner prior to Covid cannot determine the circumstances of the current charges, for the 2020-2021 school year," (*id.*);

3) "[e]nforcing the exact terms of the Last Chance [Provision] would be unfair given the extraordinary circumstances imposed by the Covid pandemic, which could not possibly have been foreseen when petitioner entered into the agreement in 2019," (*id.* at 10); and

4) the hearing officer improperly considered and found Plaintiff guilty of alleged misconduct in January 2020, which was "not within the time frame that petitioner ha[d] been charged with" and, therefore, violated her due process rights, (*id.* at 9-10).

Defendant does not dispute that these were the central holdings in the Orange County Court's decision but argues that they have no bearing on this case, since the state court proceeding did not include allegations of race discrimination, which is the basis of this case. (Docket No. 43 at 29-30).

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to a material fact "exists for summary

judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (citation and internal quotations omitted).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal citations omitted).  That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.  The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  Under federal law, the moving party may meet its burden of proof simply by pointing to the absence of evidence to support an essential element of the plaintiff's claim. *See Tenay v. Culinary Teachers Ass'n of Hyde Park*, 281 F. App'x 11, 12-13 (2d Cir. 2008) (summary order) ("[T]he moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citation and internal quotations omitted).  Therefore, Defendant may meet its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," but need not "raise a *prima facie* case."  *Hughes v. U.S.*, No. 12 Civ. 5109 (CM), 2014 WL 929837, *4 (S.D.N.Y. Mar. 7, 2014) (quoting *Celotex*, 477 U.S. at 325).

Once the moving party has met its initial burden, the burden shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Holcomb*, 521 F.3d at 137.  "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249-50), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In doing so, Plaintiff "'may not rely on conclusory allegations or unsubstantiated speculation,' but must support the existence of an alleged dispute with specific citation to the record materials." *Hughes*, 2014 WL 929837, at *3 (internal citations omitted); *see also* Fed. R. Civ. P. 56(c).  Additionally, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

In the Southern District of New York, the party moving for summary judgment must submit a short and concise statement of material facts it contends are undisputed, supported by evidence that would be admissible at trial. Local Civ. R. 56.1.  The party opposing summary judgment must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").  However, "uncontested fact[s] cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement"—in the absence of

citations or "where the cited materials do not support the factual assertions in the [s]tatements."

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations and internal quotations

omitted), *abrogated on other grounds*, *Moll v. Telesector Res. Grp., Inc.*, No. 20-3599, 2024 WL

820179 (2d Cir. Feb. 28, 2024).  Furthermore, the Court is "not required to consider what the

parties fail to point out." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)

(citations and internal quotations omitted).

## III.    DISCUSSION

### A.    Race Discrimination Under Title VII

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to

discriminate against any individual with respect to compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex or national origin." 42

U.S.C. § 2000e–2(a)(1).  Employment discrimination claims under Title VII are reviewed under

the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). *See also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330-31

(S.D.N.Y. July 21, 2020).  "Although intermediate evidentiary burdens shift back and forth

under this framework, the ultimate burden of persuading the trier of fact . . . remains at all times

with the plaintiff." *Reeves*, 530 U.S. at 143 (internal quotations omitted).

First, a plaintiff must establish a *prima facie* case of discrimination. *See Jones v. Yonkers

Pub. Sch.*, 326 F. Supp. 2d 536, 542 (S.D.N.Y. 2004).  If the plaintiff satisfies his *prima facie*

burden, a presumption of unlawful discrimination is raised. *Id.*  The burden then shifts to the

employer "to articulate a legitimate, clear, specific and non-discriminatory reason" for the

adverse employment action. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995).  If the

defendant satisfies this burden of articulation, plaintiff bears the ultimate burden of showing that the employer's stated reason was pretext for discrimination. *See Jones*, 326 F. Supp. 2d at 543.

1.   ***Prima Facie* Case**

To establish a *prima facie* case of discrimination, Plaintiff must show: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138.  Plaintiff's burden in presenting a *prima facie* case is "not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is described as *de minimis*, *see, e.g.*, *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

Here, Defendant concedes that Plaintiff is a member of a protected class based on her race, that she was qualified for her position as a speech therapist, and that her firing was an adverse act. (Docket No. 43 at 20) ("Defendant does not contest that Plaintiff was a member of a protected class, qualified for her position, or that her employment termination constituted an adverse act.").  However, Defendant argues that Plaintiff has "failed to satisfy the other prima facie elements" of her Title VII claim, (*id.*), namely, proving that her firing "was motivated at least in part by an impermissible reason, *i.e.*, a discriminatory reason." *Pease v. Cty. of N.Y.*, 19 Civ. 7693 (KPF), 2021 WL 2651400, at **11-12 (S.D.N.Y. June 28, 2021) (citations and internal quotations omitted).

To demonstrate discriminatory intent for purposes of establishing her *prima facie* case, Plaintiff must adduce evidence supporting the inference that "discriminat[ion] was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (emphasis in

- 18 -

original).  The necessary inference may be derived from a variety of circumstances, including

"the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its

invidious comments about others in the employee's protected group; or the more favorable

treatment of employees not in the protected group; or the sequence of events leading to the

plaintiff's discharge." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded*

*by statute on other grounds*, *Vogel v. CA, Inc.*, 662 F. App'x 72 (2d Cir. 2016).

 An inference of discrimination may be proven by direct or indirect evidence.  "Direct

evidence of discrimination includes, most commonly, disparaging comments regarding a

protected class." *Pease*, 2021 WL 2651400, at *11 (citing *Littlejohn v. City of New York*, 795

F.3d 297, 312 (2d Cir. 2015)).  "Indirect evidence includes evidence that similarly situated

comparators outside of Plaintiff's protected class were treated more favorably than Plaintiff."

(*Id.*).  This requires Plaintiff to show that: (1) she was "similarly situated in all material respects

to the individuals with whom [she] seeks to compare [herself];" (2) the comparator was "subject

to the same performance evaluation and discipline standards;" and (3) the comparator engaged in

comparable conduct. *Id.* (internal quotations omitted).

 Here, Plaintiff argues that while there is no direct evidence of discrimination by the

District, she has met her initial burden because "[t]he totality of the circumstances [] give rise to

an inference of discrimination . . . [and] there is a genuine issue of fact as to whether Plaintiff's

termination was at least in part the result of racial animus." (Docket No. 51 at 24).  Specifically,

she argues that: (1) Ms. Brooks, the principal at SMS, testified that the District "discriminated

against her [Ms. Brooks] based on race (African-American) during the time period relevant

here;" (2) the District has a long history of "refusing to provide [Plaintiff] with privileges,

conditions, and accommodations that they provided similarly situated peers, including grossly

excessive workloads, school transfers, inappropriate scrutiny, and refusal of reasonable child

care accommodations;" and (3) that during the 2020-2021 school year, the District unreasonably

increased her responsibilities in comparison to her peers, knowing she would fall behind and fail

to meet their expectations. (*Id.* at 24-25).  In response, the District contends that Plaintiff has

failed to establish discriminatory intent because: (1) "Plaintiff was hired and fired by the same

entity, the Board;" (2) she has not identified "similarly situated comparators to show evidence of

discriminatory intent;" and (3) there is no evidence that the District gave her additional

responsibilities during the 2020-2021 school year due to her race, or that the increase was

disproportionate to other similarly-situated providers at SMS. (Docket No. 43 at 22-25).

     First, Plaintiff's argument that Ms. Brooks' deposition testimony supports an inference of

discrimination against Plaintiff is unavailing.  While Ms. Brooks testified that she believes the

District discriminated against her based on her race and gender, by not increasing her pay

"according to a scale of others" even though it increased her "responsibilities compared to

others," she did not offer specifics as to the basis for this contention nor did she express a belief

that Plaintiff was similarly discriminated against. (Def. Ex. L at 17-18).  As a result, her

statements do not constitute evidence of discriminatory motive against Plaintiff. *See Lulo v. OTG

Mgmt., LLC*, 19 Civ. 3776 (PAE), 2022 WL 409224, at *5 (S.D.N.Y. Feb. 10, 2022) (holding

that a "sparsely developed circumstance" of alleged discrimination against another employee is

"insufficient to permit an inference" of discrimination); *Divers v. Metro. Jewish Health Sys.*, No.

06-CV-6704 (RRM)(JMA), 2009 WL 103703, at *17 (E.D.N.Y. Jan. 14, 2009) ("general

statements" by a coworker consisting "largely of conclusory allegations and personal opinions"

in support of a plaintiff's discrimination claim are insufficient to establish racial animus)

(collecting cases), *aff'd*, 383 F. App'x 34 (2d Cir. 2010).

Moreover, Plaintiff's argument ignores the fact that Ms. Brooks was the supervisor that initiated the disciplinary proceedings against her in 2021. (Def. 56.1 ¶¶ 74-76). Ms. Brooks sent Plaintiff the March 11, 2021 letter informing her that she must attend a virtual meeting to discuss the IEP Direct report showing she failed to account for 887 speech therapy sessions. (*See* Def. Ex. II) (March 11, 2021 letter from Ms. Brooks informing Plaintiff that she must attend a virtual meeting that "may be disciplinary in nature"). When that meeting failed to induce a change in Plaintiff's conduct, Ms. Brooks sent her a 45-day notice on April 5, 2021, pursuant to the terms of the Last Chance Provision in the Stipulation, giving her a formal deadline by which she was required to catch up on all outstanding records. (*See* Def. Ex. JJ). In addition, Ms. Brooks is also African American, which "undercuts Plaintiff's efforts to contend that there are disputed issues of material fact concerning her ability to prove a prima facie case of discrimination." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015), *aff'd*, 661 F. App'x 87 (2d Cir. 2016); *see also Moore v. Time Warner GRC 9*, 18 F. Supp. 2d 257, 262 (W.D.N.Y. 1998) ("the fact that [plaintiff's supervisor], possibly [plaintiff's] strongest critic and the person who initiated his termination, is African-American, is wholly inconsistent with [plaintiff's] theory that the termination decision was motivated by race."). Thus, Ms. Brooks' testimony about her own experience with discrimination does not give rise to an inference of discrimination against Plaintiff.

Second, Plaintiff has failed to identify similarly situated comparators that were treated differently on the basis of race. She argues that the proper comparators are speech therapists at other schools within the District because SMS did not have any other speech therapists, and she "was the only African-American speech therapist and was the only speech therapist who had to document sessions on two platforms [IEP Direct and the Google Spreadsheet]" while

simultaneously being forced "to cover classes" and take on supervisory duties. (Docket No. 51 at 26-27).  Defendant responds that speech therapists at other schools are not proper comparators because: (1) Plaintiff spent the vast majority of her time at SMS; (2) Mr. Brancato, the vice-principal that instituted the Google Spreadsheets [one of the "two platforms"], only worked at SMS; and (3) other pull-out service providers like Plaintiff at SMS "were required to perform this task." (Docket No. 43 at 23).

In evaluating proper comparators, "[t]he employees' positions, job responsibilities, and reporting structures are relevant." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015).  Even though "an employee with a different supervisor can still serve as a comparator," that employee and the argued comparator must be "subject to the same workplace standards and disciplinary procedures." *Williams v. PMA Companies, Inc.*, 564 F. Supp. 3d 32, 50 (N.D.N.Y. 2021) (internal quotation omitted).  Further, while having a different supervisor is not dispositive, it is an important factor in the analysis. *See Syrkin v. State Univ. of New York*, No. 04-CV-4336 (FB)(RML), 2008 WL 4179690, at *7 (E.D.N.Y. Sept. 10, 2008) (noting that "when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects"), *aff'd*, 370 F. App'x 150 (2d Cir. 2010); *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 525 n.38 (S.D.N.Y. 2007) ("[a]dditionally, [the proposed comparators] had different supervisors than plaintiff, which has been recognized as a factor militating against finding individuals similarly situated"), *aff'd*, 288 F. App'x 757 (2d Cir. 2008).

Neither party disputes that Plaintiff primarily worked at SMS, that she was the only speech therapist assigned there,[13] that Ms. Brooks and Mr. Brancato were her direct supervisors

---

[13] Plaintiff also notes that she was the only African American speech therapist in the District, but this is a disparate treatment case, not a disparate impact case, so statistical data alone is insufficient to establish an inference of discrimination. *See Miles v. City of New York*, No. CV-99-7365 (JGR)(LM), 2002 WL 31410346, at *4 (E.D.N.Y.

and worked only at SMS, and that the Google Spreadsheet requirement was imposed by Mr.

Brancato for all pull-out service providers at SMS. (*See* Pl. 56.1 Resp. ¶¶ 24-25, 27, 106).  Thus,

a reasonable jury could not find that speech therapists at other schools in the District are proper

comparators because they had different supervisors, and Plaintiff's supervisor, Mr. Brancato,

was the person who imposed the new Google Spreadsheet requirement. *See, e.g.*, *Baity v. Kralik*,

51 F. Supp. 3d 414, 447 (S.D.N.Y. 2014) ("[t]his difference [in supervisors] is significant

enough to prevent a reasonable jury from finding that [a plaintiff's proposed comparators] were

similarly situated so as to allow the drawing of an inference of discrimination"); *Szewczyk v. Cty.

of N.Y.*, 17-CV-1884 (MKB), 2020 WL 13890927, at *14 (E.D.N.Y. Mar. 31, 2020) (same).[14]

Moreover, the entire "District experienced some shortage of teachers and substitute teachers

during the COVID-19 pandemic," so increased responsibility was not limited to Plaintiff and,

therefore, is not evidence of discrimination against her. (Def. 56.1 ¶ 147).[15]  As a result, Plaintiff

has failed to identify a similarly situated comparator that was treated differently than her on the

basis of race.

   Third, the remaining examples Plaintiff claims give rise to an inference that the District

discriminated against her on the basis of race fare no better.  For example, the fact that Mr.

---

Oct. 24, 2002) ("In a disparate treatment case where the plaintiff is an individual, as opposed to a class, statistical
data alone does not establish a prima facie case.").

[14] While Defendant avers that the proper comparator here would be other pull-out service providers assigned to SMS
that reported to Mr. Brancato and were required to complete the Google Spreadsheet, these providers did not have
the same responsibilities as Plaintiff during the 2020-2021 school year (*e.g.*, covering classes, monitoring halls, etc.)
because they were "only at SMS on an as needed basis and otherwise travelled between the other schools to provide
services." (Def. 56.1 ¶ 151).  Thus, they are not directly comparable.  Nor would SMS teachers who had to take on
more responsibility during the 2020-2021 school year be an apt fit in this instance since they recorded attendance on
another platform and, as a result, were not required to complete the Google Spreadsheet. (*Id.* ¶¶ 99, 106).

[15] Plaintiff states that "to her knowledge no other speech therapist (none who were African-American) in the District
had addition to her duties [sic] . . . [to] cover classes, hall duty and supervisory duty." (Pl. 56.1 Resp. ¶ 147).
However, the only evidence she cites in support of that statement is her own Declaration. *See Deebs v. Alstom
Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (holding that relying "almost exclusively" on one's "own
deposition testimony . . . is insufficient to defeat summary judgment.").

Brancato introduced the Google Spreadsheet during the 2020-2021 school year, even though

Plaintiff was allegedly already recording attendance through IEP Direct and had an unsustainable

increase in responsibility due to the pandemic, is insufficient to raise an inference of

discrimination since he was new to the position. *See, e.g.*, *Beers v. NYNEX Material Enterprises*

*Co.*, No. 88 CIV. 0305 (MBM), 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992) ("a new

manager is allowed to appraise an employee's work according to his or her own expectations,

even if those expectations are contrary to a prior manager's expectations.").  Similarly, the

District's denial of Plaintiff's request to come to work late at the beginning of the 2020-2021 is

not evidence of discrimination since no similar requests were granted for non-African American

teachers or pull-out service providers in the school district unless they were working part-time

pursuant to the FFCRA. (*See* Def. 56.1 ¶ 156; Def. Ex. GGG).

　　　　Furthermore, Plaintiff's allegation regarding a student's inappropriate comments towards

her does not establish an inference of discrimination.  The student neither referenced nor alluded

to Plaintiff's race. (Def. Ex. HHH at 7) (student asks Plaintiff to send him "the fricken class

code" to "do my god dam homework," and referred to her as a "boomer.").  Even if he had: (1)

the student does not work for the District; (2) Plaintiff confirmed in e-mail correspondence with

Mr. Brancato that she spoke to his mother "who was apologetic;" (3) Mr. Brancato asked to meet

with the student when he was "physically in the building;" and (4) Plaintiff did not request

further discipline against him at the time. (*Id.* at 2).  Similarly, Plaintiff's complaints about not

having a proper therapy room and being subject to unfair "micro scrutiny" also fail to raise an

inference of discrimination as both complaints predate her termination by many years and were

waived in the Stipulation.  For example, the supervisor Plaintiff claims subjected to her to

"microscopic scrutiny," (Pl. Decl. ¶ 15), resigned in 2017—years before the events complained

of in this action and the signing of the Stipulation occurred. (Def. 56.1 ¶ 139).  Thus, these allegations are insufficient to infer discriminatory animus.  *See Cruz v. Bernstein Litowitz Berger & Grossman LLP*, 20-CV-8596 (VF), 2023 WL 2691456, at *14 (S.D.N.Y. Mar. 29, 2023) (holding that conduct that occurred in 2018, and "6 months prior to [a plaintiff's] termination [in 2019]. . . was too temporally remote" to establish "a causal nexus between the incident and [the plaintiff's] termination"); Stipulation at 7-9 ("Employee hereby waives any and all claims that she might otherwise have asserted through the date of this Agreement . . . pursuant to Title VII of the Civil Rights Act of 1964).

Finally, Plaintiff's argument that her allegations, when considered together, raise an inference of discrimination, even if they fail to do so when considered independently, does not cure the problem.  Plaintiff's argument is essentially that the District was committing a continuing violation that, when viewed as a whole, demonstrates a pattern or practice of discrimination. (Docket No. 51 at 28-30).  However, the continuing violation doctrine "is not an independent theory of liability" and "[a] pattern or practice case is not a separate and free-standing cause of action, but rather a method of proving a disparate treatment claim," which "is not available to nonclass, private plaintiffs." *Tassy v. Buttigieg*, 51 F.4th 521, 530 (2d Cir. 2022) (internal quotations omitted) (cleaned up); *see also Nieves v. Angelo, Gordon & Co.*, 341 F. App'x 676, 679 (2d Cir. 2009) (affirming district court's finding that plaintiff "cannot state a *prima facie* case because she fails to offer any evidence to show that her termination was causally connected to her [protected class]") (emphasis in original); *Richardson v. New York State Dep't of Corr. Servs.*, No. 97-CV-0818E (SR), 2001 WL 603705, at *7 (W.D.N.Y. May 29, 2001) (holding that summary judgment is proper where "[b]eyond conclusory assertions [] plaintiff has failed to present any issue of material fact which would suggest that the conduct

complained of was motivated by some discriminatory intent"), *aff'd*, 28 F. App'x 69 (2d Cir. 2002).[16]

Accordingly, Plaintiff has failed to establish a *prima facie* case of race discrimination under Title VII.

## 2.    Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

Assuming, *arguendo*, that Plaintiff has established a *prima facie* case of race discrimination, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for her termination. *See Holcomb*, 521 F.3d at 138.  The "defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotations omitted) (emphasis in original).  At this stage, the burden on the defendant is one of articulation. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997).  "[T]he defendant need not persuade the court that it was actually motivated by its proffered reasons." *Id.*

The District asserts that Plaintiff was fired for failing to document and record her speech therapy sessions in IEP Direct for the 2020-2021 school year, as required by school policy and the Last Chance Provision of the Stipulation. (Docket No. 43 at 21)  In response, Plaintiff argues that the District is precluded under the doctrine of collateral estoppel from making this argument because the Orange County Court previously held "that Plaintiff had not neglected her responsibilities" and that "there was no basis for arguing that the Last Chance Provision had

---

[16] Defendant also argues that because Plaintiff was hired and fired by the same entity—the Newburgh City School District—there is a presumption that the decision was made without discriminatory intent. (Docket No. 43 at 15). This argument is unpersuasive as: (1) the case Defendant cites involves a plaintiff that was hired and fired by "the same supervisor" not the same entity, as in this case, *see Varno v. Canfield*, 664 F. App'x 63, 65 (2d Cir. 2016); and (2) the District hired Ms. O'Neill over a decade before it fired her, so the likelihood that the same individuals on the school board that hired her also made the decision to fire her is low.

been violated" since the pandemic rendered the 2020-2021 school year dissimilar to prior years. (Docket No. 51 at 21).

Collateral estoppel, or issue preclusion, forecloses "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *N.H. v. Me.*, 532 U.S. 742, 748-49 (2001)). "The doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Parker v. Blauvelt Volunteer*, 690 N.Y.S.2d 478, 482 (N.Y. 1999). A pending appeal "does not prevent the use of the challenged judgment as the basis of collateral estoppel." *77 Water St., Inc. v. JTC Painting & Decorating Corp.*, 50 N.Y.S.3d 471, 475 (2d Dep't 2017). However, the doctrine "is [] flexible" and "can never be rigidly or mechanically applied." *Merrill v. Copeland*, 3:19-cv-1240 (BKS)(ML), 2022 WL 3212075, at *9 (N.D.N.Y. Aug. 9, 2022) (internal quotation omitted), *aff'd*, 2024 WL 119261 (2d Cir. Jan. 11, 2024).

Collateral estoppel does not apply here. First, the issues in the two proceedings are not identical. In the Orange County Court case, Plaintiff argued that the hearing officer's decision "was not supported by substantive evidence and was arbitrary and capricious, violated due process, and the penalty in light of the circumstances is shocking to ones' sense of fairness." (Docket No. 54-1 at 5). Plaintiff did not argue that the hearing officer's decision (or her subsequent termination as a result) was based on racial discrimination. Collateral estoppel is inapplicable on this basis alone. *See Ifedigbo v. Buffalo Pub. Sch.*, 13-CV-637S, 2018 WL 1256197, at *8 (W.D.N.Y. Mar. 12, 2018) (holding that where a plaintiff "did not raise his race-discrimination claims in the Article 78 proceeding, nor did the state court make any findings

- 27 -

concerning what role . . .  race played in Defendants' decision [to fire the plaintiff]. . . not all of the issues raised in this action are the same" and collateral estopped does not apply).

Second, the Orange County Court did not make any factual findings as to whether Plaintiff actually failed to keep her IEP Direct records up to date in 2020-2021, or whether this was the District's true motivation for firing her.  The court's decision was limited to holding that the hearing officer's opinion was arbitrary and capricious because she: (1) improperly "relied on the number of documents in evidence, rather than the substance of the documents;" (2) improperly considered allegations of misconduct prior to 2020 as a basis for finding that Plaintiff violated the Last Chance Provision in 2020-2021; and (3) failed to take into account the COVID-19 pandemic as a reason why applying the Stipulation would be "unfair." (Pl. Ex. 1 at 7, 9-11). Thus, the issue of whether the District's stated reason for firing her—that she failed to keep her IEP Direct records current in 2020-2021—is legitimate and non-discriminatory was not fully and fairly litigated, so collateral estoppel does not apply.[17] *Cf.*, *Gomez v. New York City Dep't of Educ.*, 21-CV-01711 (AT)(SN), 2022 WL 6564737, at *5 (S.D.N.Y. Aug. 15, 2022) ("[f]ederal courts have consistently found that a state court's determination that a termination was not arbitrary or capricious does not actually and necessarily decide the question of whether the termination decision was made with discriminatory intent where Plaintiff did not raise the issue in the Article 78 proceeding") (internal quotation omitted) (collecting cases), *report and recommendation adopted*, 2022 WL 4298728 (S.D.N.Y. Sept. 19, 2022).

---

[17] The pendency of Defendant's appeal of the Orange County Court's decision does not factor into this finding since it is well-established under New York law that appealing a decision "does not preclude the application of collateral estoppel." *Manhattan Rev. LLC v. Yun*, 16 Civ. 0102 (LAK)(JCF), 2017 WL 1330334, at *4 n.4 (S.D.N.Y. Apr. 10, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 3034350 (S.D.N.Y. July 17, 2017); *McGuinn v. Smith*, 11-CV-4761 (CS), 2012 WL 12887595, at *9 (S.D.N.Y. Sept. 7, 2012) (same).

Third, to satisfy its burden under the second step of the *McDonnell Douglas* framework, the District need not *prove* at this stage that its legitimate, non-discriminatory reason for firing Plaintiff was accurate or correct—it is sufficient to merely articulate such a reason. *See St. Mary's Honor Ctr.*, 509 U.S. at 509 ("[b]y producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production[.] . . . For the burden-of-production determination necessarily *precedes* the credibility-assessment stage") (emphasis in original); *Szuszkiewicz v. JPMorgan Chase Bank*, 257 F. Supp. 3d 319, 326 (E.D.N.Y. 2017) ("At this stage, the employer need only articulate—but need not prove—the existence of a nondiscriminatory reason for its decision.").  Therefore, even if the Orange County Court had held that Plaintiff satisfied her record-keeping responsibilities in 2020-2021 and did not violate the Last Chance Provision as a result, that holding would go to the potentially pretextual nature of the District's reason for firing her, which is the third step under *McDonnell Douglas* framework. *See McDonnell Douglas Corp.*, 411 U.S. at 804.

As a result, by stating that Plaintiff was fired because she failed to update IEP Direct during the 2020-2021 school year, not due to her race, Defendant has satisfied its burden of articulation.  *See, e.g.*, *Ragin v. E. Ramapo Cent. Sch. Dist.*, 417 F. App'x 81, 82 (2d Cir. 2011) (citing plaintiff's "failure to complete a substantial amount of her assigned work" as a legitimate, non-discriminatory reason for her termination); *Nieves*, 341 F. App'x at 679 (noting that "failure to complete assigned tasks" is a legitimate non-discriminatory reason for an employee's termination); *Edwards v. Rochester Inst. of Tech.*, Case # 10-CV-6553 (FPG), 2018 WL 1569357, at **17-18 (W.D.N.Y. Mar. 29, 2018) (holding that firing plaintiff because her "work deficiencies . . . did not improve" after she was given "a written warning" constitutes a "legitimate, nondiscriminatory reason . . . [for] ultimately terminating her employment").

Accordingly, Defendant has satisfied its burden under the second step of *McDonnell Douglas* by pointing to a legitimate, non-discriminatory reason for firing Plaintiff.

**3.     Evidence of Pretext**

Since Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, the burden now shifts back to Plaintiff to offer evidence that would allow a rational juror to conclude that the District's purported reason for terminating her is pretext for race discrimination. *See Hicks*, 509 U.S. at 507-08.  "To show pretext, a plaintiff must submit admissible evidence showing circumstances to permit a rational finder of fact to find that the defendant's conduct was motivated in whole or in part by discrimination." *Daly v. Westchester Cnty. Bd. of Legislators*, 19-CV-04642 (PMH), 2023 WL 4896801, at *6 (S.D.N.Y. Aug. 1, 2023) (quotation omitted).  The evidence offered must "go beyond self-serving and conclusory allegations that the defendants' proffered reasons were false." *Id.*  However, falsity itself is not enough, Plaintiff must prove both that the reason was false "and that discrimination was the real reason." *Messinger v. JPMorgan Chase Bank, N.A.*, 126 F. Supp. 3d 376, 385 (S.D.N.Y. 2015).

Here, Plaintiff argues that Defendant's stated justification for firing her was false and her termination was motivated by racial animus because: (1) the IEP Direct reports generated by Ms. Orwick are inaccurate and "[t]here is evidence that the reports can be specifically customized and potentially manipulated," (Docket No. 51 at 29); (2) the District is exaggerating the extent to which she fell behind on her record-keeping responsibilities, and the only reason she fell behind at all was "because of her onerous duties and responsibilities during the 2020-2021 COVID school year," (*id.* at 26); (3) the District did not tell her that IEP Direct was to be prioritized over the Google Spreadsheet and the Google Spreadsheet "was not the requisite platform to be used by the Special Education Department," (*id.* at 22); and (4) "there was no appropriate legal

rationale to argue that Plaintiff's conduct triggered the application of the Last Chance Provision," (*id.* at 26).  Defendant offers admissible evidence to rebut each of these allegations.

Plaintiff's claim that the IEP Direct reports were inaccurate and "potentially manipulated" lacks evidentiary support besides her own, self-serving testimony. (Pl. 56.1 Resp. ¶¶ 85-90).  In contrast, Defendant cites to: (i) testimony from Ms. Orwick, the individual that generated the September 1, 2020 through March 26, 2021 reports, confirming that they show Plaintiff failed to enter data for "over 800" of her speech therapy sessions, (Def. Ex. E at 79-92, 103-10); (ii) the reports themselves, which show, on their face, that Plaintiff failed to enter notes in IEP Direct for hundreds of students during the 2020-2021 school year, (*see, e.g.*, Def. Ex. EE (IEP Direct Attendance Report showing that as of May 20, 2021, Plaintiff failed to record notes for over 800 therapy sessions); Def. Ex. LL (IEP Direct Attendance Report showing that as of June 30, 2021, Plaintiff had still failed to record notes for over 600 therapy sessions); Def. Ex. NNN (list of students assigned to Plaintiff for 2020-2021); Def. Ex. RRR (IEP Direct Summary of Session Notes for Plaintiff in 2020-2021)); and (iii) IEP Direct Access Reports, showing Plaintiff had failed to even log into the system for extended periods of time during the 2020-2021 school year,[18] (Def. Ex. E at 475-80 and Def. Ex. MM, NN).  Thus, Plaintiff's conclusory allegations of inaccuracy are insufficient to establish pretext.

The same is true for Plaintiff's argument that the IEP Direct reports overstate her recordkeeping deficit.  She argues that the reports do not include records for students who she marked "not available" in IEP Direct because they failed to return their teletherapy consent form.

---

[18] Plaintiff denies this allegation, arguing that IEP Direct "can be easily manipulated," and that she provided therapy to more students than indicated in the report. (Pl. 56.1 Resp. ¶¶ 68, 93).  However, she fails to point to evidence substantiating her allegation that it was manipulated. (*Id.*) (citing to ¶ 38 of her Declaration, which also fails to cite to admissible evidence supporting the notion that the report was "manipulated.").  Moreover, Plaintiff's argument proves Defendant's point as there would be no way for the District to know if she was providing therapy to students unless she recorded it as required.

However, again, Plaintiff cites only to her own testimony to support this allegation, (Pl. 56.1 Resp. ¶ 84), and ignores: (1) the testimony from Ms. Orwick that, "both student not available and student absent are the data" included in the "student absence field," (Def. Ex. E at 500-05); and (2) e-mails from the IEP Direct vendor confirming that "Student Absence," "Provider Absence," "Student Not Available," and "Provider Not Available" were included "in the Student Absence and Provider Absence columns on the report," (Def. Ex. LLL at 1).  Further, the IEP Direct session notes submitted for students that had submitted teletherapy consent forms, show that in many cases Plaintiff continued to mark them not available anyway.  (Docket No. 60 ¶ 3; Def. Ex. RRR, SSS).

Plaintiff's argument also overlooks a key point: even if the reports were inaccurate, that alone is not sufficient to establish pretext—Plaintiff must also prove that the real reason she was fired was because of her race. *Messinger*, 126 F. Supp. 3d at 385; *see also Cope v. Wal-Mart Stores E., LP*, 3:15-CV-01523 (CSH), 2017 WL 2802722, at *14 (D. Conn. June 28, 2017) ("[m]erely showing that an employer's decision was wrong or mistaken is not enough to discredit the employer's proffered reasons for termination because the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.") (citation and internal quotation omitted).  Here, Plaintiff maintains that the increase in her responsibilities due to the COVID-19 pandemic prevented her from keeping her records up to date, and, thus, establishes pretext.  However, this ignores that all teachers at SMS, including non-African Americans, had an increased workload during the pandemic. (Def. Ex. H) (Plaintiff confirming that other teachers had to cover classes during the pandemic).[19]  It also ignores that Plaintiff's failure to record required notes was an issue before

---

[19] Plaintiff argues in her response to Defendant's Rule 56.1 Statement that she was not a teacher, so these are not proper comparators. (Pl. 56.1 Resp. ¶ 147).  This is true, but overlooks that Plaintiff was the only full-time pull-out

the 2020-2021 school year, (Def. 56.1 ¶¶ 32-50), and the District asked to meet with her regarding the problem before the school shut down due to the COVID-19 pandemic, (Def. Ex. BB) (letter from the District dated January 10, 2020, directing Plaintiff to attend a meeting to discuss her session notes).  Therefore, Plaintiff has failed to show that the District's reliance on her poor recordkeeping to justify her termination was simply pretext to fire her based on race.

Furthermore, Plaintiff's argument that the Google Spreadsheet caused her to fall behind on IEP Direct records, and that the District's subsequent decision to direct Mr. Brancato to stop using it is evidence of pretext is not supported by the record. (Docket No. 51 at 24-25).  As an initial matter, Plaintiff's struggle to keep her IEP Direct records up to date long predates Mr. Brancato's hiring and his introduction of the Google Spreadsheet. (*See* Def. 56.1 ¶¶ 32-50; Def. Ex. D (the Stipulation); Def. Ex. I (Mr. Brancato testifying that he became Assistant Principal at SMS in 2018)).  Moreover, Plaintiff was not the only pull-out service provider at SMS required to complete the Google Spreadsheet, and Mr. Brancato testified that those other providers did not similarly fall behind. (Def. 56.1 ¶¶ 106-07 (collecting references to testimony confirming that all pull-out service providers at SMS were required to complete the Google Spreadsheet); ¶ 118 (collecting references to testimony confirming other pull-out service providers at SMS completed their logs without issue)).

Plaintiff's argument that no other speech therapists in the District had to complete the Google Spreadsheet is inapposite because she was the only speech therapist assigned to SMS at the time and Mr. Brancato only worked at SMS. (Def. Ex. I at 12, Pl. 56.1 Resp. ¶ 25). Similarly, her argument that Mr. Brancato could have just used IEP Direct records to obtain the

---

service provider at SMS during the pandemic, so looking at whether other pull-out service providers who were "only at SMS on an as needed basis," (Def. 56.1 ¶ 151), during the 2020-2021 school year had a similar increase in responsibility would not shed light on the District's reasons for her increased workload.

attendance information sought is misleading, since Plaintiff admits she also failed to keep those records current. (Docket No. 51 at 26) (admitting she "fell behind because of her onerous duties and responsibilities during the 2020-2021 COVID school year.").  Nor does the District's decision to direct Mr. Brancato to cease using the Google Spreadsheet make his prior introduction of it pretextual—new supervisors are allowed to create novel assignments and programs that differ from prior supervisors. *See Amley v. Sumitomo Mitsui Banking Corp.*, No. 19 Civ. 3777 (CM)(BCM), 2021 WL 4429784, at *17 (S.D.N.Y. Sept. 27, 2021) ("A change in management's evaluation of an employee's performance cannot by itself raise an inference of pretext, and such an inference is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda") (internal quotation omitted).

Finally, Plaintiff erroneously argues that her failure to update IEP Direct during the 2020-2021 school year cannot be the basis for her termination under the Last Chance Provision of the Stipulation because the pandemic rendered it dissimilar to her prior misconduct. (Docket No. 51 at 26).  First, Paragraph 1 of the Last Chance Provision, detailing the substance of Plaintiff's prior misconduct, makes no reference to the volume of records she failed to complete or number of other tasks on her plate when she was previously disciplined. (Def. Ex. D ¶ 1) ("Ms. O'Neill admits that during the 2016-17 and 2017-18 school years she did not accurately document speech services for certain students on her caseload.").  Therefore, the phrase "substantially similar" in the Last Chance Provision refers solely to her failure to previously complete IEP Direct records in a timely manner. *See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 41 (2d Cir. 2019) ("[a] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

Second, even if Plaintiff was correct about the meaning of "substantially similar," she fails to acknowledge the context in which that phrase is used. The Last Chance Provision states,

> If at any time prior to the last day of the 2021-22 school year, additional Education Law 3020-a disciplinary charges are preferred against Ms. O'Neill and she is determined by the appointed hearing officer to have engaged in neglect of duty substantially similar to that referenced in Paragraph 1 and/or . . . [for] failure to accurately and contemporaneously document (within 30 days of service delivery) Speech and Language services she delivers or is required to deliver to the students on her caseload . . . the penalty will be her termination from employment as a teacher in the District.

(Def. Ex. D ¶ 11). The clause requiring her present misconduct to be "substantially similar" to the conduct giving rise to the Stipulation is separated from the "failure to accurately and contemporaneously document" clause by "and/or." (*Id.*). Thus, the Last Chance Provision allows Plaintiff to be terminated *either* for conduct "substantially similar" to prior misconduct *or* for an entirely new "failure to accurately and contemporaneously document . . . Speech and Language services." *See Simpson v. Bell*, 557 F. Supp. 3d 365, 377 n.9 (E.D.N.Y. 2021) ("the words and/or commonly mean the one or the other or both'") (quoting *Loc. Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Com. of Mass.*, 666 F.2d 618, 627 (1st Cir. 1981)). Therefore, the Last Chance Provision did not limit the District to terminating Plaintiff solely based on conduct that was "substantially similar" to misconduct she confessed to in the Stipulation.

Third, Plaintiff's argument that, by waiving any additional charges or claims based on her prior misconduct in the Stipulation, the District was prohibited from considering that prior misconduct in deciding whether she violated the Last Chance Provision in 2020-2021, (Docket No. 51 at 7, 34), reads conditions into the agreement that do not exist. The Stipulation only states that the parties were waiving prior "claims, charges, suits, etc." as of the effective date, not that they were erasing it from their memory entirely. (Def. Ex. D ¶ 16). Moreover, Plaintiff's

proffered interpretation renders the "substantially similar" clause, that she relies on in her other argument, entirely meaningless because the District would not be able to compare her current misconduct to the prior misconduct.  Since "[t]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract," Plaintiff's interpretation must be rejected. *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010) (internal quotation omitted).  Regardless, Plaintiff fails to submit admissible evidence buttressing her novel reading of the Stipulation.  Consequently, she has failed to sustain her burden and raise a genuine issue of material fact for trial.

In sum, Plaintiff has failed to set forth admissible evidence demonstrating that the District's decision to terminate her based on her failure to keep IEP Direct up to date was pretextual.[20]  Accordingly, Defendant's motion to dismiss Plaintiff's Title VII claim is granted.

## B.    Plaintiff's State Law Claim

Plaintiff's remaining claim arises under the NYSHRL.  Defendant argues that if the Court grants summary judgment on Plaintiff's federal claim, it should "decline to exercise supplemental jurisdiction over Plaintiff's [remaining] state law claim." (Docket No. 43 at 28).  In response, Plaintiff argues that the Court should retain jurisdiction because "discovery is completed, the state law claims are not novel, and the federal and state law claims are substantially identical." (Docket No. 51 at 32 n.3).

District courts "may decline to exercise jurisdiction over a claim" where it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367.  The decision to exercise

---

[20] To the extent Plaintiff is also arguing pretext based on Ms. Brooks' testimony, her former student's inappropriate comments, a prior supervisor's "microscopic supervision" of her, not having a suitable therapy room, and/or the District's refusal to allow her to come to work late, those arguments fail for the same reasons they were insufficient to demonstrate discriminatory intent. *See supra* Section III.A.1; *accord Shaw v. McHugh*, No. 12-CV-6834 (CS), 2015 WL 1400069, at *12 n.17 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 641 F. App'x 95 (2d Cir. 2016).

supplemental jurisdiction "is within the sound discretion of the district court." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013). "Where 'all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . point toward declining to exercise jurisdiction over the remaining state law claims.'" *Fitzgerald v. We Co.*, 20 Civ. 5260 (AT), 2022 WL 952963, at *10 (S.D.N.Y. Mar. 30, 2022) (cleaned up) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998).

Here, Plaintiff's only claim arising under federal law—employment discrimination under Title VII—has been dismissed. Her remaining claim arises under state law, which "[is] subject to a different standard than" her Title VII claim, *Whitney v. Montefiore Med. Ctr.*, 21 Civ. 9623 (PAE), 2023 WL 7386400, at *27 (S.D.N.Y. Nov. 8, 2023), and may "embed[] potentially complex questions of state law." *Ebel v. G/O Media, Inc.*, 20 Civ. 7483 (PAE), 2022 WL 2359245, at *30 (S.D.N.Y. June 30, 2022); (*see also* Docket No. 51 at 19). Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim for employment discrimination and imposition of a hostile work environment under the NYSHRL.

Accordingly, Plaintiff's state law claim is dismissed without prejudice to renew in state court.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII claim, and that claim is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim and dismisses that

claim without prejudice to renew in state court.  The Clerk is respectfully directed to terminate

the pending motion (Docket No. 42), enter judgment for Defendant, and close the case.

Dated:   June 26, 2024
        White Plains, New York

                             **SO ORDERED:**

                             JUDITH C. McCARTHY
                             United States Magistrate Judge